# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA, *ex rel.*　)
JENNIFER BUTH, *et al.*,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiffs,　　)　　Case No. 2:18-cv-00840-NJ
　　　　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　)　　Honorable Nancy Joseph
　　　　　　　　　　　　　　　　　)
WALMART INC.,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendant.　　)
_____)

## PLAINTIFF-RELATOR JENNIFER BUTH'S RESPONSE IN OPPOSITION TO DEFENDANT WALMART INC.'S <u>MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>

Nola J. Hitchcock Cross
Mary C. Flanner
CROSS LAW FIRM, S.C.
845 North 11th Street
Milwaukee, Wisconsin 53233
(414) 224-0000
njhcross@crosslawfirm.com
mflanner@crosslawfirm.com

David J. Chizewer
Matthew K. Organ
Roger A. Lewis
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 201-4000
david.chizewer@goldbergkohn.com
matthew.organ@goldbergkohn.com
roger.lewis@goldbergkohn.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

GENERAL BACKGROUND ............................................................................................. 5

STANDARD OF REVIEW ................................................................................................ 6

THE FALSE CLAIMS ACT .............................................................................................. 7

ARGUMENT ...................................................................................................................... 8

I.    WALMART FALSIFIES CLAIMS DATA TO OVERBILL THE GOVERNMENT FOR
      A GREATER DAYS' SUPPLY OF INSULIN AND PRESCRIPTION CREAMS THAN
      PRESCRIBED, IN VIOLATION OF THE FCA. ............................................................ 8

      A.    Walmart's Days'-Supply Scheme (Counts Two, Five, and Six) ............................. 8

      B.    Walmart's Days'-Supply Scheme Violates the False Claims Act. ........................ 11

            1.    Falsification of Days'-Supply Data in PDE Records Submitted to the
                  Government Constitutes an Actionable False Claim. ............................... 11

            2.    Days'-Supply Data in PDE Records is Material to the Government's
                  Payment Decision. ................................................................................... 14

II.   WALMART "SHORT-FILLS" PRESCRIPTIONS AND CHARGES THE
      GOVERNMENT FOR MEDICATION THAT IS NOT ACTUALLY PROVIDED TO
      THE PATIENT, IN VIOLATION OF THE FALSE CLAIMS ACT. .............................. 18

      A.    Walmart's Short-Fill Scheme (Counts One, Five and Six) ................................... 18

      B.    The Short-Fill Scheme Violates the False Claims Act. ........................................ 19

III.  WALMART IMPROPERLY CONVERTS 30-DAY PRESCRIPTIONS TO 90-DAY
      PRESCRIPTIONS IN VIOLATION OF THE FALSE CLAIMS ACT. .......................... 23

      A.    Walmart's 30-to-90-Day Scheme (Counts Three, Five and Six) .......................... 23

      B.    The 30-to-90-Day Scheme Violates the False Claims Act. ................................... 25

IV.   RELATOR'S ALLEGATIONS THAT WALMART'S SCHEMES ARE COMPANY-
      WIDE ARE SUFFICIENT UNDER RULE 9(B). ........................................................ 27

V.    RELATOR'S STATE LAW CLAIMS HAVE BEEN SUFFICIENTLY PLED. ............. 28

VI.   NO CLAIMS SHOULD BE DISMISSED ON LIMITATIONS GROUNDS. ................ 29

VII.    ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE............................................. 30

CONCLUSION .......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*AnchorBank, FSB v. Hofer*,
    649 F.3d 610 (7th Cir. 2011) .................................................. 7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................... 6

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................... 6

*Brookdale Senior Living Cmtys, Inc. v. United States ex rel. Prather*,
    139 S. Ct. 1323 (2019) ...................................................... 21

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
    No. 18-315, -- S. Ct. --, 2019 WL 2078086 (U.S. May 13, 2019) ........... 29

*Cook Cty. v. United States ex rel. Chandler*,
    538 U.S. 119 (2003) .......................................................... 8

*Corley v. Rosewood Care Ctr., Inc.*,
    142 F.3d 1041 (7th Cir. 1998) ............................................... 7

*EEOC v. Concentra Health Services*,
    496 F.3d 773 (7th Cir. 2007) ................................................ 6

*Garcia v. City of Chicago*,
    24 F.3d 966 (7th Cir. 1994) ................................................ 30

*Gibson v. City of Chicago*,
    910 F.2d 1510 (7th Cir. 1990) ............................................... 6

*Glaser v. Wound Care Consultants, Inc.*,
    570 F.3d 907 (7th Cir. 2009) ............................................... 22

*Goldberg v. Rush Univ. Med. Ctr.*,
    929 F. Supp. 2d 807 (N.D. Ill. 2013) ...................................... 30

*In re Xerox*,
    555 S.W.3d 518 (Tex. 2018) ................................................ 29

*Mason v. Medline Indus.*,
    731 F. Supp. 2d 730 (N.D. Ill. 2010) ....................................... 7

*Oasis Int'l Waters, Inc. v. United States*,
  134 Fed. Cl. 405 (2016) ............................................................. 22

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits v. Walgreen Co.*,
  631 F.3d 436 (7th Cir. 2011) .................................................. 7, 13

*United States ex rel. Berkowitz v. Automation Aids, Inc.*,
  896 F.3d 834 (7th Cir. 2018) .................................................... 18

*United States ex rel. Bibby v. Wells Fargo Bank, N.A.*,
  165 F. Supp. 3d 1340 (N.D. Ga. 2015) ................................... 14, 27

*United States ex rel. Buth v. PharMerica Corp.*,
  No. 09-C-0720, 2014 WL 4355342 (E.D. Wis. Sept. 3, 2014) ........................ passim

*United States ex rel. Drennen v. Fresenius Med. Care Holdings, Inc.*,
  No. 09-10179, 2012 WL 8667597 (D. Mass. Mar. 6, 2012) ............................ 14, 27

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
  842 F.3d 103 (1st Cir. 2016) ..................................................... 15

*United States ex rel. Fowler v. Caremark RX, L.L.C.*,
  496 F.3d 730 (7th Cir. 2007) ................................................ 21, 22

*United States ex rel. Gross v. AIDS Research Alliance-Chicago*,
  415 F.3d 601 (7th Cir. 2005) ...................................................... 7

*United States ex rel. Hubert v. Bd. of Educ. of City of Chicago*,
  No. 16 C 4336, 2018 WL 6248827 (N.D. Ill. Nov. 29, 2018) .......................... 17

*United States ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*,
  336 F. Supp. 2d 430 (E.D. Pa. 2004) ...................................... 19, 20

*United States ex rel. Kietzman v. Bethany Circle of King's Daughters of Madison, Indiana, Inc.*,
  305 F. Supp. 3d 964 (S.D. Ind. 2018) ............................................ 18

*United States ex rel. Kroening v. Forest Pharm., Inc.*,
  155 F. Supp. 3d 882 (E.D. Wis. 2016)...................................... 27, 28, 30

*United States ex rel. Lisitza v. Par Pharm. Cos.*,
  276 F. Supp. 3d 779 (N.D. Ill. 2017) ............................................ 26

*United States ex rel. Myers v. Am.'s Disabled Homebound, Inc.*,
  No. 14 C 8525, 2018 WL 1427171 (N.D. Ill. Mar. 22, 2018) ......................... 17

*United States ex rel. O'Donnell v. Am. at Home Healthcare & Nursing Servs., Ltd.*,
  No. 14-CV-1098, 2017 WL 2653070 (N.D. Ill. June 20, 2017)................... 15, 16, 18

*United States ex rel. Piacentile v. Snap Diagnostics, LLC*,
No. 1:14-CV-3988, 2018 WL 2689270 (N.D. Ill. June 5, 2018)..............16

*United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*,
892 F.3d 822 (6th Cir. 2018) ..............21

*United States ex rel. Schutte v. Supervalu, Inc.*,
218 F. Supp. 3d 767 (C.D. Ill. 2016) ..............13, 27

*United States ex rel. Spay v. CVS Caremark Corp.*,
913 F. Supp. 2d 125 (E.D. Pa. 2012)..............passim

*United States ex rel. Strauser v. Stephen L. LaFrance Holdings, Inc.*,
No. 18-CV-673-GKF-FHM, 2019 WL 1086363 (N.D. Okla. Mar. 7, 2019)..............13, 27

*United States ex rel. Thayer v. Planned Parenthood of Heartland, Inc.*,
No. 4:11-CV-00129, 2016 WL 7474797 (S.D. Iowa June 21, 2016)..............25

*United States ex. rel. Garbe v. Kmart Corp.*,
968 F. Supp. 2d 978 (S.D. Ill. 2013)..............29

*United States v. Luce*,
873 F.3d 999 (7th Cir. 2017) ..............21

*United States v. Neifert-White Co.*,
390 U.S. 228 (1968)..............8

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
136 S. Ct. 1989 (2016)..............8, 15, 18, 26

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
20 F.3d 771 (7th Cir. 1994) ..............7

**Statutes, Rules and Regulations**

31 U.S.C. § 3729 ..............2

31 U.S.C. § 3729 (b)(1)(A)(ii)–(iii) ..............21

31 U.S.C. § 3729(a)(1)(A) ..............7, 12, 20, 26

31 U.S.C. § 3729(a)(1)(B) ..............7, 12, 20, 26

31 U.S.C. § 3729(a)(1)(G) ..............7, 12, 23, 26

31 U.S.C. § 3729(b)(1) ..............7

31 U.S.C. § 3729(b)(4) ..............8

42 C.F.R. § 423.322 ................................................................. 9

42 C.F.R. § 423.329(b)(3) ...................................................... 9

42 C.F.R. § 423.343(b) ........................................................... 9

42 C.F.R. § 423.343(c)(2) ...................................................... 9

42 C.F.R. § 423.504(b)(4)(vi)(A) .......................................... 9

42 C.F.R. § 423.504(b)(iv)(A) ............................................ 25

42 C.F.R. § 423.505(i)(4)(iv) ................................................ 9

42 C.F.R. § 423.505(i)(4)(vi) .............................................. 25

42 C.F.R. § 423.505(k)(3) ...................................................... 9

42 U.S.C. § 1320a–7k(d)(1) ................................................ 23

42 U.S.C. § 1320a–7k(d)(1)(A) ........................................... 23

42 U.S.C. § 1320a–7k(d)(4)(B) ........................................... 23

Alaska Amin Code tit. 12 § 52.470(d), (d)(3) (2019) ......... 25

Conn. Gen. Stat. §20-616(b) (2018) ................................. 25

Fed. R. Civ. P. 12(b)(6) ........................................................... 6

Fed. R. Civ. P. 9(b) ...................................................... 6, 7, 13

Iowa Code Ann. § 155A.27 2018 ...................................... 25

Ohio Rev. Code Ann. § 4729.40 2017 ............................. 25

Tex. Hum. Res. Code §§ 36.002(1)-(13) .......................... 29

Va. Code Ann. § 8.01-216.5(A) ........................................... 4

Wash. Rev. Code Ann. § 18.64.520 2013 ....................... 25

Wis. Stat. § 450.11(5) ........................................................ 25

**Other Authorities**

"*PharMerica to Pay $31.5 Million to Settle Lawsuit Alleging Violations of Controlled Substances Act And False Claims Act*," Milwaukee-Wisconsin Journal Sentinel, May 15, 2015, http://archive.jsonline.com/business/pressrelease/national-press-releases/pharmerica-to-pay-315-million-to-settle-lawsuit-alleging-violations-of-controlled-substances-act-and-false-claims-act-303954121.html ................................................................................. 4

Ben Popken, "*Desperate Families Driven to Black Market Insulin*," NBC News, (April 25, 2017), https://www.nbcnews.com/business/consumer/desperate-families-driven-black-market-insulin-n730026 ......................................................................................... 10

CMS, *Medicare Prescription Drug Benefit Manual*, Pub. No. 100-18, ch. 9, § 70.1.3 .............. 20

*Department of Justice, Office of Public Affairs Press Release*, dated May 14, 2015, https://www.justice.gov/opa/pr/long-term-care-pharmacy-pay-315-million-settle-lawsuit-alleging-violations-controlled ....................................................................................... 4

*Department of Justice, U.S. Attorney's Office Press Release*, dated Jan. 22, 2019, https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-2692-million-recovery-walgreens-two-civil-healthcare* .......................................................................... 3, 16

# INTRODUCTION

On January 12, 2018, a customer at a Walmart store in New Berlin, Wisconsin approaches the pharmacy counter to fill a prescription for Lantus, an insulin medication that is dispensed in pen form. The prescription is written for 36 units of insulin per day; the customer's Medicare plan limits supply to 30 days. Walmart's pharmacy employees – under-trained, inexperienced, and impelled by Walmart corporate policy to prioritize speed and profit – never calculate that only three Lantus insulin pens are required to fill the prescription. Instead, in order to meet Walmart's cut-throat speed requirements for filling prescriptions that are enforced with yellow-light/red-light warnings, Walmart's pharmacy employees, following Walmart's unofficial but routine policy, grab a full, unbroken box of five Lantus pens from the supply shelf and dispense it to the customer. Over-supplying customers with medication is only profitable if someone is willing to pay full price for it. In order to get Medicare to pay for this over-supply, Walmart falsifies the claim record that it submits to Medicare for the customer's Lantus, claiming that the amount it dispensed and charged Medicare for was only a 30-days' supply. In reliance on the false claim, the Government pays Walmart for two more Lantus pens than prescribed, the extra pens costing the Government hundreds of dollars.

This scheme to over-supply customers at the Government's expense – referred to herein as the "Days'-Supply Scheme" – is repeated over and over at Walmart stores throughout the country, not just with prescription insulin but also with prescription creams. It is just one of several systematic schemes embarked on by Defendant Walmart, Inc. ("Walmart") through its pharmacy operations to defraud the Government, as alleged in Plaintiff-Relator Jennifer Buth's ("Relator") Amended Complaint ("Complaint" or "Compl.") in this action (Dkt. No. 17). Specifically, Relator alleges that Walmart causes the Government to:

- Pay for more medication than is actually prescribed by doctors to Walmart's customers, through Walmart's falsification of days'-supply data in prescription claims (the Days'-Supply Scheme);

- Pay for more medication than is actually dispensed to Walmart's customers, through Walmart's falsification of quantity data in prescription claims that Walmart has "short-filled" (the "Short-Fill Scheme"); and

- Pay for 90 days of medication on 30-day-plus-refills prescriptions that Walmart automatically converts and submits without notification to the customer or the exercise of pharmacist judgment (the "30-to-90-Day Scheme").

These schemes, individually and cumulatively, have led to massive Government overpayments for insulin and other drugs to Walmart and its nationwide network of stores.

Relator brought this case on behalf of the United States under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("False Claims Act" or "FCA"), and on behalf of the various States under their respective false claims acts. As a pharmacy manager at Walmart's New Berlin, Wisconsin store, Relator personally observed and alleges Walmart's company-wide pharmacy culture of "speed and greed," and the details of each scheme that this culture has engendered, including specific examples of false claims submitted by Walmart to the Government in furtherance of each scheme (including the example referenced above).

Walmart's Motion to Dismiss and Memorandum of Law in Support thereof (Dkt. Nos. 38 and 40) (the "Motion"), mechanically applies the FCA-defendant playbook for such pleadings, invoking Rule 9(b) and challenging the sufficiency of Relator's allegations of falsity, materiality, and scienter under the False Claims Act. Each of Walmart's arguments regarding the Days'-Supply Scheme, the Short-Fill Scheme, and the 30-to-90-Day Scheme fails as a matter of law.

The False Claims Act's requirements of falsity and materiality are readily satisfied by Walmart's falsification of claims data that are express conditions of Government payment, and Relator's allegations of scienter are more than adequate at the pleadings stage. In fact, one of Walmart's schemes at issue here – the Days'-Supply Scheme, involving the systematic over-supply of insulin pens to beneficiaries of Government health programs – is identical to a scheme engaged in by Walgreens (Walmart's competitor), resulting in Walgreens' payment of $209.2 million to the Government in January 2019. *See Department of Justice, U.S. Attorney's Office Press Release*, dated Jan. 22, 2019, https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-2692-million-recovery-walgreens-two-civil-healthcare.[1] Walmart's parallel conduct at issue here confirms the illegality and materiality of its conduct.

In attempting to bolster its fragile arguments for dismissal, Walmart mischaracterizes, or fails even to reference, the allegations in Relator's Complaint, and misstates the relevant law. The Motion further seeks to improperly limit Relator's claims, at this early pleadings stage, to only the single Walmart store at which she worked, ignoring her specific and reliable claims that each scheme was endemic to Walmart on a company-wide basis. Walmart even obscures the United States' election not to intervene in this action at this time, implying that the decision was made on the merits (*see* Motion at 1-2). Yet the United States made clear that it was the expiration of the seal period, before the United States had concluded its investigation, that led to its election, expressly leaving the door open to later intervention. *See* Dkt. No. 19 ("In its Order dated December 28, 2018, the Court ruled that the Government must make its intervention decision by January 2, 2019, and that no further extensions of time would be granted. <u>The Government's investigation has not been completed and, as such, the United States is not able to</u>

---

[1] *See* Motion at 16 n.10 (establishing that courts in the Seventh Circuit can take "judicial notice of reliable information published on the internet") (and cases cited therein).

decide, as of the Court's deadline, whether to proceed with the action. Accordingly, the United States hereby notifies the Court that it is not intervening at this time. However, the Government's investigation continues.") (emphasis added).

Notably, Relator has identified and rectified fraud by a national pharmacy chain that employed her once before, filing suit on behalf of the United States under the False Claims Act against PharMerica in a case that withstood a motion to dismiss (much like Walmart's Motion here), resulting in recovery for the Government in excess of $30 million. *See United States ex rel. Buth v. PharMerica Corp*., No. 09-C-0720, 2014 WL 4355342 (E.D. Wis. Sept. 3, 2014); *Department of Justice, Office of Public Affairs Press Release*, dated May 14, 2015, https://www.justice.gov/opa/pr/long-term-care-pharmacy-pay-315-million-settle-lawsuit-alleging-violations-controlled.[2]  Invoking the False Claims Act once again to rectify fraud, as Relator has done here by initiating this action against Walmart, does not make Relator an opportunistic, serial filer, as Walmart implies (Motion at 2); rather, it commends her as a public servant who reliably identifies and reports fraud on the Government.

Relator's Complaint sufficiently alleges violations of the False Claims Act and state false claims statutes. Accordingly, the Motion should be denied as to all claims asserted in the Complaint, other than Count Four which Relator voluntarily dismisses, without prejudice.[3]

---

[2] For more information on the PharMerica settlement, *see* "*PharMerica to Pay $31.5 Million to Settle Lawsuit Alleging Violations of Controlled Substances Act And False Claims Act*," Milwaukee-Wisconsin Journal Sentinel, May 15, 2015, http://archive.jsonline.com/business/pressrelease/national-press-releases/pharmerica-to-pay-315-million-to-settle-lawsuit-alleging-violations-of-controlled-substances-act-and-false-claims-act-303954121.html.

[3] Upon review of the Motion and relevant authority, Relator has elected to voluntarily dismiss, without prejudice, her claims arising from a fourth scheme alleged in the Complaint, relating to the falsification of expiration dates on prescription claims submitted to the Government, subject to further investigation by Relator and/or the Government. (*See* Compl., ¶¶ 254-259, and Count Four.) Pursuant to Va. Code Ann. § 8.01-216.5(A), Relator has obtained the Commonwealth of Virginia's separate, written consent to dismissal without prejudice of this claim; Virginia's false claims statute is the only statute invoked in Relator's Complaint requiring such consent prior to voluntary dismissal of a non-intervened claim.

## GENERAL BACKGROUND

Walmart is the largest company in the world by revenue. (Compl. ¶ 102.) About 3,500 of Walmart's stores in the United States include pharmacy operations, at which hundreds of prescriptions are dispensed daily at each store. (*Id.* ¶¶ 103-04.) As of 2010, Walmart's pharmacy operations trailed only Walgreens and CVS Corporation in number of pharmacists and pharmacies in the United States. (*Id.* ¶ 109.) Roughly half of Walmart's dispensed prescription drugs are for beneficiaries of Government health plans. (*Id.* ¶ 105.)

The specific allegations relating to the Days'-Supply Scheme, the Short-Fill Scheme, and the 30-to-90 Scheme as set forth in the Complaint are described below in the Argument sections discussing each scheme. Underlying and giving rise to each scheme are company-wide directives, policies, and Walmart's corporate culture, as Relator has meticulously detailed in the Complaint based upon her personal knowledge and experience (Compl. ¶¶ 138-142; *see also id.* ¶¶ 102-136; 152-180). These include, in brief summary, as follows:

- Walmart's corporate managers closely monitor, time, and ruthlessly enforce "super-human" speeds at which Walmart staff is required to fill prescriptions, with the goal of continuously increasing the volume of prescriptions filled at each Walmart pharmacy to the point where accuracy and compliance with the law are not possible. (*Id.* ¶¶ 128-132.) Among other Walmart initiatives, when a pharmacist is "falling behind" Walmart's aggressive prescription-filling metrics, Walmart's system begins to flash yellow and then red depending on how far behind the pharmacist is, requiring the staff to move even more quickly. (*Id.* ¶¶ 130-132.) Pharmacy employees like Relator are forced to choose between meeting professional and legal standards versus meeting Walmart's required production standards, with their jobs on the line if they choose against Walmart's corporate directives requiring speed. (*Id.* ¶ 141.) These are not store-

specific policies and directives, but company-wide Standard Operating Procedures ("SOPs"). (*E.g., id.* ¶¶ 116-118, 128-132, 158.)

- With the goal of minimizing costs, Walmart employs the lowest-salaried, least-qualified workers that it can under applicable licensure laws, then shirks its legal responsibility to provide adequate training to that staff, leaving inexperienced, under-paid, and untrained workers to execute the "super-human" requirements to dispense drugs subject to the Controlled Substances Act, as described in the Complaint. (*Id.* ¶¶ 144, 152-180.) Walmart's training and education requirements, which are standard and implemented the same way company-wide, are not designed to ensure regulatory compliance and prevent prescription error, but rather to provide "cosmetic cover" for Walmart's actual, enforced directives prioritizing speed and profit. (*Id.* ¶¶ 158-59.)

## STANDARD OF REVIEW

Walmart moves to dismiss Relator's Amended Complaint under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b). A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of a complaint, not its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A claim must be merely facially plausible, meaning that the pleadings must allow the court to draw the reasonable inference that the defendant is liable for the purported misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claims must be described "in sufficient detail to give the defendant 'fair notice of what the … claim is and the grounds upon which it rests.'" *EEOC v. Concentra Health Services*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 555 (2007)).

In addition to meeting the standard under Rule 12(b)(6), claims brought under the False Claims Act, an anti-fraud statute, are subject to the heightened pleading requirements of Rule 9(b), which requires a pleading to state with particularity the circumstances constituting the

alleged fraud. *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011)). "A plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud," but only provide representative examples. *Mason v. Medline Indus.*, 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010).

One of the primary purposes of Rule 9(b)'s heightened pleading requirements is to provide notice to the defendants of the claims lodged against them. *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777-78 (7th Cir. 1994). The requirements of Rule 9(b) can be relaxed, however, when the plaintiff lacks access to all facts necessary to support her claim, *see Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998), and courts and litigants are advised not to take an overly rigid view of these requirements. *Pirelli*, 631 F.3d at 442.

## THE FALSE CLAIMS ACT

The False Claims Act prohibits, *inter alia*, (1) knowingly presenting or causing to be presented to the Government a false or fraudulent claim for payment or approval; (2) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (3) knowingly failing to return overpayments received from the Government. 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B) and (a)(1)(G).[4] To be actionable, such conduct must be done "knowingly," defined as actual knowledge or with deliberate ignorance or reckless disregard of the truth. 31 U.S.C. § 3729(b)(1). In addition, the false statement must be

---

[4] As Walmart points out (Motion at 5), both the current False Claims Act, amended in 2009, as well as the previous version of the statute, have relevance to this case. Relator agrees, however, that the differences between the two versions are immaterial to Walmart's Motion; the Complaint survives under both iterations of the FCA.

material.  "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  Alleging that compliance with an identified statute, regulation, or contractual provision is a condition of payment imposed by the Government, and further that the statute, regulation, or provision has been violated by the defendant, is evidence of materiality, although this is not dispositive.  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016) ("*Escobar*").  A false claim is material if it goes to the "essence of the bargain" between the defendant and the Government.  *Id.*, n.5.  The Supreme Court has explained that "Congress wrote [the FCA] expansively … 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"  *Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

The Medicare Part D prescription drug benefit is unique among government healthcare programs because, while federally funded,  it is administered by private insurance companies, or "Part D Sponsors."  (Compl. ¶¶ 78-91.)  Nonetheless, false or fraudulent claims submitted to Part D Sponsors are treated as claims to the Government for purposes of the FCA. *See, e.g., Buth*, 2014 WL 4355342 at *5 (reasoning that such false claims "cause" the Sponsors to submit corresponding false claims to the Government).

## ARGUMENT

### I.  WALMART FALSIFIES CLAIMS DATA TO OVERBILL THE GOVERNMENT FOR A GREATER DAYS' SUPPLY OF INSULIN AND PRESCRIPTION CREAMS THAN PRESCRIBED, IN VIOLATION OF THE FCA.

#### A.  Walmart's Days'-Supply Scheme (Counts Two, Five, and Six)

As a contract provider for a Part D Plan Sponsor, Walmart is required to comply with all applicable "[f]ederal laws, regulations, and [Centers for Medicare & Medicaid Services ("CMS")] instructions," and with all applicable pharmacy and prescription drug state standards.

(Compl. ¶¶ 82, 85, citing 42 C.F.R. § 423.505(i)(4)(iv) and § 423.504(b)(4)(vi)(A).) Walmart is further required, as a contract provider, to certify that claims data that it submits to the Government is accurate, complete, and truthful, and to certify its understanding that the claims data that it submits will be used to obtain Government payments. (Compl. ¶ 86, citing 42 C.F.R. § 423.505(k)(3).)

To support its claims for Government payment of prescription drugs, Walmart sends Prescription Drug Event ("PDE") data to CMS. (Compl. ¶ 87.) PDE data includes the drug dispensed, prescription number, the quantity dispensed, days' supply, and other critical data elements. (*Id.* ¶¶ 88-90, 204.) Given that PDE data is used to support Walmart's claims for Government payment, the PDE data submitted by Walmart to support its claims must be accurate as a condition of Walmart receiving payment, pursuant to 42 C.F.R. § 423.505(k)(3). (Compl. ¶¶ 88-90.) *See also* 42 C.F.R. §§ 423.322, 423.329(b)(3), 423.343(b) and (c)(2).

"Days' supply" – how long the amount dispensed will last if used according to the prescription's directions – is PDE data element Number 19, and must be calculated and submitted by the pharmacy in order to determine payment. (Compl. ¶ 204.) Most Medicare Part D Plans limit reimbursement of insulin pen supplies to 30 days' supply. (*Id.* ¶ 210 (citing Medicare publication).) Accordingly, a report by Walmart, for example, that the amount of insulin pens dispensed to a beneficiary is limited to a 30 days' supply – when the amount dispensed actually exceeds the 30-day upper limit – is inaccurate, incomplete and untruthful (in a word, "false"), and directly leads the Government to paying more money for, and for a greater supply, than the prescription required and the law allows. (*Id.* ¶¶ 90, 211-12.)

Relator alleges that it is Walmart's "unofficial but regularly followed policy" to overfill, dispensing and charging the Government, for example, for a full box of five insulin pens when

fewer are required to fill the prescription. (*Id.* ¶ 208; *see also id.* ¶¶ 199-222.) Pursuant to Walmart's directives and SOPs, Walmart's pharmacists and technicians are never provided with adequate time, and never take the time, to calculate how many insulin injection pens should actually be dispensed to customers based on doctors' prescriptions. (*Id.* ¶¶ 199, 207-08.) Instead, regardless of the amount of insulin prescribed, Walmart dispenses an entire box of five insulin pens to every customer with an insulin pen prescription.[5] (*Id.* ¶¶ 208-09.) So as to recover the maximum reimbursable amount for the full box of pens, Walmart submits a claim – a PDE record – that falsely states that the amount supplied was a 30-day supply. (*Id.* ¶¶ 204, 209-11.) The result is that customers get, and the government pays for, far more insulin than prescribed.[6]

Walmart's Days'-Supply Scheme extends to drugs other than insulin. Relator alleges that Walmart pharmacists systematically supply larger and more expensive 30-gram and 80-gram tubes of prescription Triamcinolone cream when a 15-gram tube would suffice to meet the doctor's prescription. (Compl. ¶¶ 214-216.) As it does with boxes of insulin pens, Walmart then submits claims to the Government through PDE records falsely stating days' supply, thus over-supplying the beneficiary and over-billing the Government. (*Id.* ¶¶ 213-216.)

---

[5] Physicians write prescriptions for insulin in number of units of insulin per day. (Compl. ¶ 203.) Insulin comes in pens that contain a certain number of units. (*Id.* ¶¶ 204-205.) Thus, figuring out how many pens to dispense takes time; a Walmart pharmacy technician, systematically under-qualified and under-trained, would have to make calculations from the doctor's original prescription to determine how many insulin pens are required to fill each prescription, calculations which they never perform and do not have time to perform. (*Id.* ¶¶ 152, 205, 208.)

[6] There is an ongoing shortage of affordable insulin in the U.S., giving rise to a "black market" in insulin trading. *See* Ben Popken, "*Desperate Families Driven to Black Market Insulin,*" NBC News, (April 25, 2017), https://www.nbcnews.com/business/consumer/desperate-families-driven-black-market-insulin-n730026. *See also* Compl. ¶ 15 (citing tripling in insulin costs between 2002 and 2013). Walmart's scheme of over-supplying its customers and over-charging the Government may contribute to this public health crisis by distorting the marketplace, supplying the black market, and putting at risk patients' health and their adherence to physician instructions. *Id.* ¶¶ 14-18.

Relator includes in her Complaint two specific examples of this scheme in the form of claims submitted to Government programs with false days'-supply data that resulted in an over-supply to the patient and over-charging of the Government. (*Id.* ¶ 211.) In each of these examples, the Government paid for five insulin pens when the prescription called for only three pens (if a proper calculation from the units of insulin prescribed had been made), costing the Government hundreds of unnecessary dollars for supplying 40% more medication than Walmart's customers had been prescribed by their physicians. (*Id.* ¶¶ 211-213)

**B.    Walmart's Days'-Supply Scheme Violates the False Claims Act.**

In rejecting motions to dismiss challenging False Claims Act claims like Walmart's here, courts have uniformly recognized that PDE records constitute "claims" and that the data therein is "material" to the Government's payment decision under the False Claims Act, as PDE record accuracy is a "condition of payment." *See Buth*, 2014 WL 4355342, at *6-7 (citing *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012)). Walmart's challenges to Relator's Complaint regarding the Days'-Supply Scheme similarly fail.

**1.    Falsification of Days'-Supply Data in PDE Records Submitted to the Government Constitutes an Actionable False Claim.**

In *Spay*, the relator alleged that the defendants – a pharmacy chain (CVS) and pharmacy benefit manager (Caremark) – violated the False Claims Act by falsifying PDE records, further alleging that the accuracy of PDE records is an express condition of payment. *Spay*, 913 F. Supp. 2d at 151-52, 171. In fact, like here, the relator in *Spay* alleged that "fraudulent adjudication of claims processed for quantities of drugs or days' supply over the approved limit" was one of the false claims underlying his allegations of a nationwide fraud scheme. *Id.* at 137, 176-177. The court in *Spay* denied the defendant's motion to dismiss challenging the sufficiency of these allegations, finding that the relator had "(1) adequately identified a condition of

payment, i.e. the requirement that a PBM certify the accuracy of its data relating to payment; (2) [] established that 'data relating to payment' includes the thirty-seven fields on the PDE records; and (3) [] alleged falsity in some of those fields with sufficient particularity." *Id*. at 131, 158.

Relator's allegations here readily satisfy the same criteria: Walmart certifies the accuracy of its data relating to payment for prescription drugs, including PDE data (Compl. ¶ 86); the PDE data that Walmart certifies includes days' supply (*id.* ¶ 204); and Walmart systematically falsifies the days' supply data in order to over-charge the Government, in violation of Sections (a)(1)(A), (a)(1)(B), and (a)(1)(G) of the False Claims Act (*id.* ¶¶ 208-09; Counts Two, Five, and Six.)

Indeed, Walmart's Motion does not challenge that the submission of PDE data falsely stating days' supply constitutes a false claim. Instead, Walmart argues that Relator has not pleaded the scheme with sufficient particularity, claiming that her allegations are a series of "unsubstantiated conclusions." (Motion at 16.) Yet there is nothing "unsubstantiated" or "conclusory" about Relator's allegations in the Complaint because they are based on her personal knowledge as Walmart's pharmacy manager with licensed responsibility for Walmart's pharmacy operations at her location, which operations are systematized on a company-wide basis. (Compl. ¶¶ 27-28, 139-141.) Relator was personally trained on Walmart's corporate policy of "rapid-fire dispensing," and personally observed that the policy makes it impossible to convert insulin prescriptions from units-per-day to days'-supply and pens-per-script. (*Id.* ¶ 207.) Breaking open boxes and determining the correct number of pens takes more time than Walmart allows; accordingly, as Relator personally observed, it is not done. (*Id.* ¶¶ 207-08.) Further, Relator personally observed that Walmart's policies lead directly to the regular, systematic submission of false claims to the Government, wherein Walmart falsifies the days'-supply field in PDE records for insulin pen (and prescription cream) prescriptions so as to dispense a full box of pens (or a

larger tube of cream) when fewer were required by the prescription, at substantially greater cost to the Government. (*Id.* ¶¶ 209, 211-12, 216-17.) Finally, Relator alleges from her own knowledge that the "false submission of claims with days' supply far below that actually provided to Beneficiaries is a widespread and knowing practice at Walmart's pharmacies" (*Id.* ¶ 217), citing the same practices at other Walmart stores in Waukesha, Wisconsin, Mt. Sterling, Kentucky, Bentonville, Arkansas, and Belmont, North Carolina. (*Id.* ¶¶ 218, 221.)

Contrary to Walmart's suggestion, a False Claims Act relator is not required to personally observe every fraudulent claim to understand and allege that the fraud that she has personally observed is company-wide. *See United States ex rel. Strauser v. Stephen L. LaFrance Holdings, Inc.*, No. 18-CV-673-GKF-FHM, 2019 WL 1086363, at *14 (N.D. Okla. Mar. 7, 2019) ("Although the specific examples of false claims alleged in the FAC come from a single pharmacy, relator's factual allegations support a reasonable inference that false claims were submitted across the pharmacy chain."); *United States ex rel. Schutte v. Supervalu, Inc.*, 218 F. Supp. 3d 767, 774 (C.D. Ill. 2016) ("The Relators alleged with particularity the Defendants' uniform, nationwide fraudulent scheme, alleged claims for payment on an individualized transaction level and provided specific examples of the Defendants' fraudulent conduct. They need not plead redundant examples for every State or Federal program that the Defendants defrauded. The Relators simply need 'some firsthand information to corroborate its suspicions.'") (quoting *Pirelli*, 631 F.3d at 446); *Spay*, 913 F. Supp. 2d at 177-78 ("Certainly, Plaintiff cannot be expected to plead with particularity each and every false claim nationwide without the benefit of at least some discovery, as such information rests solely within Defendants' control. In turn, such allegations are sufficient to allege, at this stage of the litigation, a nationwide False Claims Act under Rule 9(b). The Court therefore declines to dismiss this claim."); *United States ex rel.*

*Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1340, 1348 (N.D. Ga. 2015) ("There would be no reason to think that this commercial conduct was confined just to one region of the country. This inference of nationwide conduct has been drawn by other courts in similar situations."); *United States ex rel. Drennen v. Fresenius Med. Care Holdings, Inc*., No. 09-10179, 2012 WL 8667597, at *2 (D. Mass. Mar. 6, 2012) ("[Relator] further alleges that, by reason of Fresenius' national billing practices, this billing likely occurred at Fresenius' other facilities throughout the country. Drennen has pleaded the specific false claims with enough particularity to satisfy the requirements of Rule 9(b).").

Even if Relator's allegations of the Days'-Supply Scheme were limited exclusively to her own Walmart store – they are not, given her allegations about four other Walmart stores in three other states – they are more than sufficient to state a claim under the False Claims Act.

### 2. Days'-Supply Data in PDE Records is Material to the Government's Payment Decision.

The *Spay* decision further confirmed that PDE data, including specifically the days'-supply field in PDE records, is "material" to the Government's payment decision as a "condition of payment," and thus actionable under the False Claims Act. *Spay*, 913 F. Supp. 2d at 167-70. Relator alleges precisely what the *Spay* court found to be adequate to satisfy the materiality element of the False Claims Act: (i) that compliance with the federal requirement that PDE records must be "true, accurate, and complete" as a condition of payment under Medicare (Compl. ¶ 89); (ii) that falsification of the Days'-Supply field in PDE data renders that data untruthful, inaccurate, and incomplete (*id.* ¶ 90); (iii) that CMS, through Part D Plan Sponsors and/or PBMs, has made payments to Walmart for Part D claims submitted by Walmart with "materially false [PDE] data" (*id.* ¶ 91); and (iv) that the Government, unaware of the falsity of

the PDE records, "paid and continues to pay the claims that would not be paid but for [Walmart's] illegal conduct." (*Id.* ¶ 270 (Count Two).)

In the False Claims Act case that Relator herself initiated against PharMerica in this judicial district, the court similarly held, following *Spay*, that accurate PDE records and compliance with PDE regulations are conditions of payment, and that false statements in PDE records are "material to the claim and have a tendency to influence the government's actions by inflating the amount of its payment." *Buth*, 2014 WL 4355342, at *7 (denying Defendants' motion to dismiss and finding Relator's allegations sufficient to allege FCA materiality).

Relator's materiality allegations relating specifically to PDE record falsification sufficed in the 2012 *Spay* and 2014 *Buth* cases, and also satisfy the materiality standard set forth by the Supreme Court in *Escobar*, 136 S. Ct. 1989 (2016). Indeed, in *Escobar* itself, the First Circuit, on remand, had "'little difficulty' reaffirming that the relators had sufficiently alleged Universal's misrepresentations to be material." *United States ex rel. O'Donnell v. Am. at Home Healthcare & Nursing Servs., Ltd.*, No. 14-CV-1098, 2017 WL 2653070, *8 (N.D. Ill. June 20, 2017) (quoting *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016)). As described in *O'Donnell*, materiality in *Escobar* turned on three factors, each of which is also present here (and was also present in *O'Donnell*): (1) "As in *Escobar*, Relator here explicitly alleges that compliance with the Medicare and Medicaid regulations named in the SAC is a condition of payment" (also true here; *see* Compl. ¶ 89); (2) "[m]oreover, courts have routinely found the various statements and regulations at issue to be central to the government's Medicare and Medicaid programs" (also true here; *see Spay; Buth; supra*); and (3) "[f]inally, the SAC contains no allegations that either the federal government or the [state] paid claims to Defendants despite knowing of the supposed violations" (also true of Relator's Complaint).

*O'Donnell,* 2017 WL 2653070, at *9. *See also United States ex rel. Piacentile v. Snap Diagnostics, LLC*, No. 1:14-CV-3988, 2018 WL 2689270, *4 (N.D. Ill. June 5, 2018) ("Here, the Complaint alleges that, according to Medicare Guidance, Medicare would only cover a second or third night of Sleep Apnea testing where it was medically necessary…. Therefore, by routinely submitting claims for unnecessary second and third nights of testing, Defendants mislead the Government. Accordingly, the Court finds that the Complaint satisfies the materiality requirement ….").[7]

Walmart argues, unpersuasively, that a patients' individualized need for insulin varies "based on blood sugar," and thus that Relator's allegations of materiality are insufficient in that they leave Walmart and the Court to "guess[] as to whether or not these alleged beneficiaries were in fact provided with more insulin than [they] required …."  (Motion at 17.)  This ignores and obscures the point.   A physician prescribes the amount of insulin that the physician determines the patient to need; a pharmacy is supposed to convert that prescription to the required days' supply, and dispense that amount.   (Compl. ¶¶ 203-05.)   Whether a patient actually uses the amount dispensed during the ensuing 30-day period is irrelevant to whether the prescription was properly dispensed, and the Government properly billed, at the time of the transaction.   Indeed, Walmart's argument would render the quantity of insulin prescribed by a physician unnecessary to the process – according to Walmart, a pharmacy can simply dispense a

_____

[7]   If there were any doubt that falsifying days'-supply data in PDE records is material to the Government's payment decision, that doubt is eliminated by the Government's recent announcement, in January 2019, that Walgreens paid $209.2 million to settle a False Claims Act case arising from Walgreens' identical scheme to overfill and over-bill the Government for insulin pens by falsifying the very same PDE record field at issue here.  *See* Department of Justice, U.S. Attorney's Office Press Release dated Jan. 22, 2019, https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-2692-million-recovery-walgreens-two-civil-healthcare ("[W]hen a full box of insulin pens exceeded the federal healthcare program's limit on the total days of supply (*i.e.*, the total number of daily doses) that could be dispensed and reimbursed at that time, WALGREENS evaded this restriction by falsely stating in its reimbursement claims that the total days of supply did not go over the limit.")  Walgreens was also required as part of the settlement to enter into a Corporate Integrity Agreement with the Government across all of its pharmacies to "foster adherence to federal health care program requirements and thereby protect the programs."  *Id.*

full box of insulin pens to every patient that is prescribed insulin, and occasionally a patient might actually use it all over the ensuing 30 days. This is nonsensical. As recognized in *Spay* and *Buth*, proper filling of prescriptions is of course material to government payment; otherwise, pharmacies like Walmart could oversupply and overbill at will, to the detriment of the Government and other payors.[8]

Walmart's remaining materiality arguments are similarly off point. Walmart cites to the Wisconsin Medicaid Administrator's suggestion that "unbreakable prepackaged items" can be dispensed in full, even if this supplies the patient beyond the days'-supply limit. (Motion at 18, and n.11.) But boxes of insulin pens are not "unbreakable"; each box contains five pens, and Walmart is required to dispense only the number of pens required by the prescription (Compl. ¶¶ 202-210). Accordingly, this single-state guidance involving unbreakable items is irrelevant. Walmart further argues, incorrectly, that Relator's Complaint contains no allegations that the Government would have denied claims for an excess of days' supply. (Motion at 17.) Yet the Complaint alleges exactly that in Count Two, the Count directed specifically to the Days'-Supply Scheme as constituting a violation of the False Claims Act. Compl. ¶ 270 (the Government, unaware of the falsity of the PDE records, "paid and continues to pay the claims that would not be paid but for [Walmart's] illegal conduct") (emphasis added).

The materiality cases that Walmart relies upon are inapposite. In *United States ex rel. Hubert v. Bd. of Educ. of City of Chicago*, No. 16 C 4336, 2018 WL 6248827, *9 (N.D. Ill. Nov. 29, 2018), the court, in dismissing a False Claims Act complaint, noted that "absent from the

---

[8]  Walmart's argument amounts, at most, to an assertion that Relator's allegations do not preclude the possibility that Walmart's systematic over-filling of insulin pens may sometimes supply beneficiaries, by pure happenstance and notwithstanding the quantity prescribed, with just what they end up using over the 30 days after their prescriptions are filled. Yet such an argument is not properly dealt with at the motion to dismiss stage, as other courts have held in dealing with "does-not-preclude" arguments like Walmart's.  *See United States ex rel. Myers v. Am.'s Disabled Homebound, Inc.,* No. 14 C 8525, 2018 WL 1427171, *6 (N.D. Ill. Mar. 22, 2018) ("Just because the particular facts as alleged leave open the possibility that some of the patients are homebound [so as to meet federal criteria] does not mean that Myers has failed to plausibly allege with particularity that the patients were not homebound.")

Complaint is *any mention of materiality*," and further that the relator had entirely failed to link amounts received by the government to false claims. (Emphasis added). Similarly, in *United States ex rel. Kietzman v. Bethany Circle of King's Daughters of Madison, Indiana, Inc*., 305 F. Supp. 3d 964, 969-70 (S.D. Ind. 2018), the court held in dismissing False Claims Act claims that the relator "[did] not tell us which guidelines and regulations were contravened, or in what respects." *See also United States ex rel. Berkowitz v. Automation Aids, Inc*., 896 F.3d 834, 841 (7th Cir. 2018) (complaint failed to "contain the underlying details of the fraud scheme," and in fact alleged that the government was aware of the issues but paid the disputed claims anyway).

Here, Relator has specifically alleged materiality, linked the amounts received for Walmart's overfills to false claims by specific reference to the "underlying details," identified the regulations that were contravened, and made no allegations that the government knew about the false claims and paid anyway, all in a manner recognized to be sufficient in *Escobar*, *O'Donnell*, *Spay* and *Buth*. Relator's allegations regarding Walmart's Days'-Supply Scheme are more than sufficient to state claims under the False Claims Act.

## II. WALMART "SHORT-FILLS" PRESCRIPTIONS AND CHARGES THE GOVERNMENT FOR MEDICATION THAT IS NOT ACTUALLY PROVIDED TO THE PATIENT, IN VIOLATION OF THE FALSE CLAIMS ACT.

### A. Walmart's Short-Fill Scheme (Counts One, Five and Six)

As alleged in the Complaint, Walmart regularly dispenses to its customers *less* than the amount of a medication prescribed by a physician, but falsely reports to the Government that the full amount was dispensed in order to coerce full payment. (*See, e.g.*, Compl. ¶ 143.) This practice is known as prescription shorting, or short-filling. (*Id.* ¶¶ 181, 198.) Walmart then sells the excess medication – for which it has already received one payment, even though it remains sitting on its shelves – a second time. (*Id.* ¶¶ 186, 194.) Walmart is aware of the excess inventory that short-filling creates, but "reconciles" its data to mask the discrepancy. (*Id.* ¶¶ 143,

188.) Walmart also knows that its relentless focus on speed and profits for the sake of accuracy causes short-filled prescriptions to regularly be dispensed. (*Id.* ¶¶ 181-196.)

The Complaint details six different instances of this scheme in action. (*Id.* ¶ 196.) For each, it details the date of the short-fill, the pharmacy where it occurred, the medication involved, the prescription number, and the date that Walmart became aware that it had billed for and received payment for a short-filled prescription. (*Id.*) Relator also alleges that in each instance, the overpayment was not reversed. (*Id.*)

**B.     The Short-Fill Scheme Violates the False Claims Act.**

As discussed above, falsities in PDE data submitted by Walmart to the Government for payment of prescription drugs constitute false claims for payment. (*See* Argument § I(B)(1), *supra*.) One of the PDE elements is the quantity of medication dispensed in a prescription. (Compl. ¶ 88.) By alleging that Walmart gives a patient one amount of a drug, but presents to the Government through the PDE record that a different and greater amount of the drug was given for which the Government is charged and pays, Relator has stated a cause of action under the False Claims Act. *Id.* *See Spay*, 913 F. Supp. 2d at 169; *Buth*, 2014 WL 4355342 at *7.

In *United States ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, the defendant was a pharmacy benefit manager that provided mail order prescriptions for Government-plan beneficiaries. 336 F. Supp. 2d 430, 434-35 (E.D. Pa. 2004). Like here, the relator in *Hunt* alleged that the defendant short-filled prescriptions and "billed for prescriptions containing less than the required number of pills." *Id.* at 436. The court had no trouble holding that these allegations were sufficient to state a False Claims Act violation, and denied the defendant's motion to dismiss: "It seems clear to this Court that any drugs charged for and not delivered are potential violations of § (a)(1). The Court sees no need to spend any more time on this well-pleaded claim." *Id.*

The same is true here. Relator alleges, with specific examples, that Walmart billed the Government for prescriptions containing less than the required number of pills, in violation of Sections (a)(1)(A) and (a)(1)(B) of the False Claims Act. (*See* Compl. ¶ 196, alleging six examples where Walmart "dispensed less than the amount of medication prescribed and billed"; Counts One and Five.) Just as in *Hunt*, these are well-pleaded claims.

Walmart's main argument as it relates to this scheme appears to be that Relator's allegations of scienter are insufficient. Yet Relator's Complaint includes detailed allegations that Walmart acted with knowledge and reckless disregard as to the falsity of its short-filled prescriptions. CMS specifically requires that Walmart's training include ways to prevent fraud caused by "shorting prescriptions" and by billing for an inaccurate amount of medication. (Compl. ¶ 97, citing CMS, *Medicare Prescription Drug Benefit Manual*, Pub. No. 100-18, ch. 9, § 70.1.3.) Instead of fulfilling this obligation, the Complaint alleges that Walmart has installed procedures and policies which inevitably result in short-filling. (Compl. ¶¶ 182-185.) In addition, Relator alleges that Walmart is aware, through its regular inventory reconciliations, that its systematic short-filling causes more medicine to be on its shelves than there should be, had prescriptions been correctly filled. (*Id.* ¶¶ 187-92.) Walmart simply "updates" the computer inventory to reflect the actual amount of medicine on its shelves, thereby "resolving" (and deleting) the discrepancy that evidenced Walmart's corporate knowledge. (*Id.* ¶¶ 188-89.) Relator raised concerns over Walmart's illegal practices to a Walmart director, expecting the director to bring the matter to corporate compliance and work to change Walmart's procedures, but nothing happened. (*Id.* ¶¶ 193-94.) Each time a customer comes into a Walmart store to complain that Walmart had short-filled the customer's prescription provides Walmart with additional knowledge of its systematic short-filling practices. (*Id.* ¶¶ 191-93, 196.)

These allegations are more than sufficient to establish knowledge and scienter at the pleadings stage. *See, e.g.*, *United States v. Luce*, 873 F.3d 999, 1008, n.29 (7th Cir. 2017) ("the FCA's knowledge requirement is met by 'deliberate ignorance' or 'reckless disregard' of the truth"), citing 31 U.S.C. § 3729 (b)(1)(A)(ii)–(iii); *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 837-38 (6th Cir. 2018), *cert. denied sub nom. Brookdale Senior Living Cmtys, Inc. v. United States ex rel. Prather*, 139 S. Ct. 1323 (2019) (allegations including insufficient and improper training, ignoring concerns over practice raised by employees, and awareness of potential violations sufficient to establish knowledge).

Nevertheless, Walmart claims that its formal policies inoculate it from its own malfeasance, and that instead of an FCA violation, Relator has merely pleaded "mistakes by staff whom she personally failed to supervise," labeling Relator's allegations of the Short-Fill Scheme "nonsensical" and full of "wild inferences." (Motion at 12-15.) This argument ignores the plain allegations of the Complaint. To the extent that any Walmart policy would have prevented false claims from being submitted, Walmart does not adhere to it, instead shorting customers such that, each and every month, Walmart ends up with excess inventory, which it records and "resolves" by dispensing the excess to another patient. (Compl. ¶¶ 181-82, 188-195, 245.) If short-filling resulted from mere mistakes, one would expect that, over time, those mistakes would be offset by over-fills; but that is not what happens. (*Id.*) At best, Walmart merely argues that Relator's allegations do not preclude the possibility that Walmart's shorting is due to errors at the store level, as opposed to a company-wide failure; but this is precisely the sort of "does-not-preclude" argument that is inappropriate at the motion to dismiss stage. *See* n. 8, *supra*.

Walmart cites *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 742 (7th Cir. 2007), *overruled by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir.

2009), in support of its "failure to supervise" argument. (Motion at 14.) Yet the *Fowler* court found the absence of requisite intent because "the Relators fail[ed] to provide any information addressing whether [defendant] knowingly took any improper actions sufficient to implicate the False Claims Act." 496 F.3d at 742 Here, there are more than sufficient allegations to establish that Walmart acted with the requisite knowledge and "reckless disregard" of the Short-Fill Scheme.[9]

Finally, Walmart cites the inapposite case of *Oasis Int'l Waters, Inc. v. United States*, 134 Fed. Cl. 405 (2016). There, the plaintiff argued that knowledge was established by way of defendant's reckless disregard of the truth of its false submissions, shown by its allegedly improper interpretation of the pertinent contract. *Id*. at 456. The court disagreed, finding after trial that the defendant's "interpretation of the contract was sincere and was reasonable given the multiple modifications" and changing nature of the contract in question, and therefore was not evidence of reckless disregard. *Id*. at 455-56. Here, there is no plausible interpretation of any relevant statute or contract that would allow for short-filling prescriptions, nor has Walmart offered one. Further, a decision issued after trial is of little guidance when addressing purported pleading deficiencies on a motion to dismiss.[10]

In addition, and in the alternative, Relator has at minimum sufficiently alleged that Walmart's Short-Fill Scheme causes "reverse false claims" in violation of the False Claims Act.

---

[9] Moreover, *Fowler* involved the "drug processing facilities" of a Pharmacy Benefit Manager ("PBM"), not a retail pharmacy. 496 F.3d at 734. This is key, because PBMs are subject to different rules than retail pharmacies as a result of the different role they play in the administration of Medicare Part D (*e.g.*, negotiating with plans, pharmacies, and manufacturers). One of these rules was at issue in *Fowler*, *i.e.*, how to account and bill for "unused" drugs that were "returned" to Caremark. *Id*. at 741. *Fowler* actually involved the exact opposite of Relator's claim here. In *Fowler*, patients/Part D *received all the drugs they paid for*, they just ended up not needing them, and the relator cited no rule that was violated. Here, Walmart's Short-Fill Scheme is straightforward: Walmart submitted an unquestionably false claim for payment of more drugs than Walmart had actually dispensed.

[10] Walmart repeats its scienter argument and cites the same cases in a separate section of its brief, claiming that it applies to all of Relators' claims. (Motion at 23.) Walmart's attack on Relator's allegations of scienter fails for the same reasons discussed in this section. Relator has alleged the requisite scienter for each of her claims.

(*See* Compl., Count Six.)  The amount of money that Walmart receives for the short-filled portion of prescriptions constitutes an "overpayment" under the law of Medicare and Medicaid. *See* 42 U.S.C. § 1320a–7k(d)(4)(B) (defining "overpayment" as "any funds that a person receives or retains… to which the person, after applicable reconciliation, is not entitled[.]")  When Walmart becomes of aware of any such overpayment, it is legally obligated to return that money to the Government.  *See* 42 U.S.C. § 1320a–7k(d)(1).  One who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" violates the FCA.  31 U.S.C. § 3729(a)(1)(G).

Walmart counters that Relator "leaves this Court impermissibly guessing as to whether a claim reversal was necessary."  (Motion at 14.)  There is no guesswork involved here: as the Complaint alleges and the law requires, a claim reversal was necessary in each of the individual transactions identified.   Even if Walmart "corrected the alleged error by providing the missing or shorted mediation to the customer" each time a customer returned with a short-filled prescription (Motion at 14) – an issue that will require discovery, and should not be decided at the pleadings stage – that is not enough.  Walmart is required to "report and return" the overpayment that it received when it filled the original prescription.  42 U.S.C. § 1320a– 7k(d)(1)(A).  As the Complaint alleges, Walmart never did this.  Its failure to report and return the overpayments is thus a violation of the FCA.

## III.  WALMART IMPROPERLY CONVERTS 30-DAY PRESCRIPTIONS TO 90-DAY PRESCRIPTIONS IN VIOLATION OF THE FALSE CLAIMS ACT.

### A.  Walmart's 30-to-90-Day Scheme (Counts Three, Five and Six)

Relator alleges that it is the "routine practice" at Walmart to "systematically change patient-beneficiaries' 30-day prescriptions to 90-days without obtaining their consent, reviewing their prescription history, or providing any [] counseling."  (Compl. ¶ 245.) The Complaint sets

forth how Walmart, with the singular goal of increasing profits, issued directives to put its 30-to-90-Day Scheme into effect. In 2015, Walmart began utilizing RxCompanion, a medication therapy management ("MTM") software program, ostensibly for legitimate purposes, like monitoring patients' prescription history to identify problems with their adherence to drug regimens. (*Id.* ¶ 223.) Rather than using its MTM program to better the health of its customers and comply with the law, Walmart employs it to identify and exploit untapped revenue streams. (*Id.* ¶¶ 224-226.) As alleged in the Complaint, senior Walmart officials directed pharmacy managers, including Relator, to use RxCompanion to identify patients with remaining refills for a prescription filled at Walmart, and on that basis alone target them "daily" to place additional orders, without considering medical need or other relevant factors, including the possibility that the customer might not need the refills or might go to a different pharmacy for them. (*Id.*)

The Complaint alleges and cites additional Walmart policy directives to push for 90-day fills of prescriptions at every opportunity. (*Id.* ¶¶ 231-32.) A 2018 email from a Walmart Clinical Services Manager removes any doubt as to the purpose of pushing for 90-day prescription fills, describing it as a "play" that will lead to better "returns" for Walmart, while remaining silent as to any benefit to the customer. (*Id.* ¶¶ 234-36.) Walmart issued "performance" metrics for its pharmacies to adhere to, but the only way to meet these metrics was to ignore the pertinent laws and regulations: Walmart employees would automatically change a 30-day fill to a 90-day one, without obtaining patient consent, reviewing the patient's prescription history, providing any MTM or other counseling, or engaging in any other form of pharmacist judgment. (*Id.* ¶ 245.) The scheme worked. During a single week across 19 pharmacies, nearly 1,000 prescriptions were converted to 90-day prescriptions. (*Id.* ¶ 249.) The Complaint further details eight examples of Walmart's scheme in action, describing with

particularity how Walmart gave each patient a 90-day supply of a drug without any exercise of pharmacist judgment, let alone obtaining consent of the customer.  (*Id.* ¶ 245.)

## B.    The 30-to-90-Day Scheme Violates the False Claims Act.

When filling prescriptions for Medicare beneficiaries, Walmart is required to comply with all applicable "federal laws, regulations, and CMS instructions," and with all applicable state standards.  (*Id.* ¶¶ 82, 85, citing 42 C.F.R. § 423.505(i)(4)(vi), §§ 423.504(b)(iv)(A)); *supra* Argument § I(B)(1)).  As alleged in the Complaint, converting customers' 30-day prescriptions to 90-day prescriptions violates laws, regulations, and guidance when it is done without reviewing the customer's prescription history, obtaining customers' consent, or exercising professional judgment of the pharmacist.  For example, pursuant to Wisconsin law, a pharmacist can convert a prescription to 90 days only as an "exercise [of] his or her professional judgment" and when "such quantity of that drug was previously dispensed to the patient in the previous 2-year period under an earlier prescription."  Wis. Stat. § 450.11(5); *see* Compl. ¶ 251.[11]  Walmart's own documents show that it was aware that its employees were "not properly doing the claims," and that state laws differ on what is required before making conversions.  (Compl. ¶¶ 235, 250.)

Walmart's practice constitutes a material misrepresentation to the Government in violation of the False Claims Act.  *See, e.g.*, *United States ex rel. Thayer v. Planned Parenthood of Heartland, Inc.*, No. 4:11-CV-00129, 2016 WL 7474797, at *12 (S.D. Iowa June 21, 2016) (alleged "automatic refill" scheme withstood motion to dismiss; "Given the factual allegations and regulations underlying this conduct, Plaintiff has therefore pleaded sufficient facts to

---

[11]  Many other states have similar requirements.  *See,* ALASKA ADMIN CODE tit. 12 § 52.470(d), (d)(3) (2019) (pharmacist may dispense up to a 100-day supply where the original prescription is for a 30-day supply, but *only* where the pharmacist is exercising her professional judgment); CONN. GEN. STAT. §20-616(b) (2018) (permitting pharmacists to use their *professional judgment* in refilling a prescription for a quantity greater than the initial quantity prescribed under certain conditions, including notice to the prescribing practitioner*)*; Ohio Rev. Code Ann. § 4729.40 2017 (permitting up to 90 days "[i]n the exercise of the pharmacist's professional judgment after consulting with the patient"); Wash. Rev. Code Ann. § 18.64.520 2013 (allowing up to 90 days when the "pharmacist is exercising his or her professional judgment"); Iowa Code Ann. § 155A.27 2018 (same),

demonstrate that this claim is 'false' for purposes of the FCA. Furthermore, the Court assumes, without deciding, that failure to disclose this practice constitutes a material misrepresentation.").

Despite this authority, Walmart argues that the Complaint fails to allege with particularity that anything false was submitted to the Government. (Motion at 6-7.) This argument ignores the Complaint's detailed allegations. As the Supreme Court clarified in *Escobar*, an implied false certification made by a defendant when seeking payment from the Government, such as a defendant's certification that it has complied with all laws when it knows that it has not, can form the basis for False Claims Act liability. *Escobar*, 136 S. Ct. at 1999. "When, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id*. The Complaint alleges precisely this scenario. (*See* Compl. ¶¶ 274-77 (Count Three).)

Walmart relies on *United States ex rel. Lisitza v. Par Pharm. Cos.*, 276 F. Supp. 3d 779 (N.D. Ill. 2017), but the scheme there was markedly different; the defendant was not unlawfully tripling the amount of medication given to a customer as here, but rather was switching the dosage form of the medication dispensed (*e.g.*, tablet versus capsule), while keeping the strength and quantity the same. *Id*. at 783. Moreover, *Lisitza* is a summary judgment opinion, issued after extensive discovery had tested the validity of the plaintiffs' allegations. Walmart's citation to the "ForwardHealth Provider Information" website (Motion at 6) is also a red herring. Just because one Medicaid provider purportedly requires that "certain medications" be dispensed in 90-day quantities does not give Walmart free reign to fill *any* prescription with a 90-day supply. Relator's allegations of the 30-to-90 Day Scheme are sufficient to state claims under Sections (a)(1)(A), (a)(1)(B), and (a)(1)(G) of the False Claims Act.

## IV. RELATOR'S ALLEGATIONS THAT WALMART'S SCHEMES ARE COMPANY-WIDE ARE SUFFICIENT UNDER RULE 9(B).

Relying on a single, inapposite case from this district, Walmart devotes a section of its Motion to what amounts to a request to limit Relator's case, at the pleadings stage, to false claims submitted at only the Walmart store where she worked, claiming that Relator did not have a sufficient vantage point from which to allege company-wide practices. Motion at 21-22 (citing *United States ex rel. Kroening v. Forest Pharm., Inc.*, 155 F. Supp. 3d 882 (E.D. Wis. 2016)).

Walmart's argument is incorrect both on the law and the facts. As noted above in Section I(B)(1), numerous courts have denied motions to dismiss False Claims Act claims brought by relators whose individual knowledge of company-wide schemes was based on experiences at a single store or at just a few locations. *See Strauser*, 2019 WL 1086363, at *14 (all of relator's examples of false claims came from a single pharmacy in a single month; yet "relator's factual allegations support a reasonable inference that false claims were submitted across the pharmacy chain."); *Schutte*, 218 F. Supp. 3d at 774 (one relator never worked at Supervalu, and the other did so only "briefly" at a single store; nevertheless, relators had at least "some firsthand information" that the conduct they observed was happening at other company stores); *Spay*, 913 F. Supp. 2d at 177-78 (relator's claims were based primarily on prescriptions issued by pharmacies in Puerto Rico, with a few from three other states; "such allegations are sufficient to allege, at this stage of the litigation, a nationwide False Claims Act [claim] under Rule 9(b)"); *Bibby*, 165 F. Supp. 3d at 1348 (relators operated in just seven states, but "[t]here would be no reason to think that this commercial conduct was confined just to one region of the country."); *Fresenius*, 2012 WL 8667597, at *2 ("[Relator] further alleges that, by reason of Fresenius' national billing practices, this billing likely occurred at Fresenius' other facilities throughout the country.").

Here, Relator's allegations are not confined to a single store or even a single state. *See supra* Argument § I(A). But even if they were, Relator has alleged facts to establish – or at least for the Court to draw reasonable inferences – that each scheme arose from policies, procedures, and a corporate culture endemic to Walmart as a whole such that each scheme is reliably alleged to have been company-wide, not limited to the specific Walmart store in Belmont, Wisconsin where Relator worked. *See supra* General Background, Argument §§ I(A), I(B), and I(C).

The sole case relied on by Walmart, *Kroening,* did not grant the defendant's motion to dismiss due to insufficient allegations of a nationwide scheme. Rather, the *Kroening* court held that plaintiff's complaint was deficient in its entirety, finding that no cognizable claim had been pleaded, let alone a nationwide claim. 155 F. Supp. 3d at 893-95. In *Kroening*, the complaint alleged violations of the Anti-Kickback Statute by virtue of a drug company paying doctors "speakers fees," enticing them to prescribe their products. However, the relator identified no "specific physicians who received kickbacks and who, in turn, wrote a lot of prescriptions for Forest drugs." *Id.* at 894. Moreover, in granting defendant's motion to dismiss with leave to replead, the court in *Kroening* recognized that, "[w]hen alleging an expansive scheme to defraud the government, the amended complaint need not contain details of every instance of fraud; rather, it need provide only representative examples of the fraud." *Id.* at 893.

Far from supporting a limitation of Relator's Complaint, *Kroening* and the cases cited above establish that Relator has sufficiently alleged, through representative examples and reliable allegations of corporate practices, procedures and culture, schemes that are company-wide in scope. No limitation of Relator's claims is appropriate.

## V.   RELATOR'S STATE LAW CLAIMS HAVE BEEN SUFFICIENTLY PLED.

Walmart makes no specific argument that any of Relator's state law claims should be dismissed. Instead, it argues that the state law claims "have parallel pleading requirements" to

Relator's FCA claims and "fail for the same reasons[.]"  (Motion at 24.)  As set forth above, however, Relator's FCA claims have been adequately pled; thus Walmart's Motion also fails as to Relator's state law claims.  *See United States ex. rel. Garbe v. Kmart Corp.*, 968 F. Supp. 2d 978, 990 (S.D. Ill. 2013) ("Kmart argues that Relator's claims based on the … statutes of twenty-six different states that are substantively similar to and/or track the language of the FCA must likewise be dismissed for all of Kmart's above-stated reasons. Because Kmart's arguments as to the state claims mirror those above, they are denied for the reasons stated above.")[12]

## VI.    NO CLAIMS SHOULD BE DISMISSED ON LIMITATIONS GROUNDS.

Walmart asks the Court to apply a six-year (instead of ten-year) statute of limitations to Relator's claims based on its incorrect prediction as to how the Supreme Court would rule on a then-pending case.  (Motion at 24.)  Since Walmart filed its Motion, the Supreme Court unanimously held that a ten-year statute of limitations period applies to FCA claims like Relator's.  *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, No. 18-315, -- S. Ct. --, 2019 WL 2078086, at *3-4 (U.S. May 13, 2019).  Thus, Walmart's statute of limitations argument, premised solely on its incorrect prediction of what the Supreme Court would do, fails as a matter of law.[13]

---

[12] In any event, Walmart is incorrect that all state false claims statutes have parallel pleading requirements.  Upon reviewing Walmart's motion, Texas' Office of Attorney General requested that Relator include the following in her Response to the Motion:  "The Texas Medicaid Fraud Prevention Act ('TMFPA') does not mirror the FCA. Under the TMFPA, liability for the Texas causes of action do not require the presentment of a false claim, and most do not require proof of materiality. Tex. Hum. Res. Code §§ 36.002(1)-(13).  In Texas, the courts look to the plain language of the statute to interpret the legislature's intent. *In re Xerox*, 555 S.W.3d 518, 527 (Tex. 2018). The Texas causes of action asserted in this case must therefore be analyzed according to the TMFPA's plain language, especially where that language differs from the FCA. *In re Xerox*, 555 S.W.3d at 535. Defendant's position, that state Medicaid fraud statutes such as the TMFPA have parallel pleading requirements to the FCA, conflicts with the plain language of the TMFPA, adds language to the elements of a TMFPA cause of action, and violates the applicable Texas rules of statutory construction."

[13] Walmart does not contend that any claim in Relator's Complaint is entirely time-barred, even under the incorrect six-year limitations period.  To the extent that Walmart seeks a court order limiting claims to those submitted within the actual, ten-year limitations period under *Cochise*, Relator has no objection in concept, although determining the precise application of the limitations period is premature at the pleadings stage.  *See Goldberg v. Rush Univ. Med.*

## VII. ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE.

In the event that the Court dismisses any of Relator's claims or the Complaint as a whole, the dismissal should be without prejudice. This is Relator's first pleading to be subjected to the Court's scrutiny. Should the Court identify any deficiencies, Relator should be given the opportunity to cure them. Indeed, that is precisely what the court did in *Kroening*, the case relied upon extensively by Defendants. There, the Government declined to intervene, and the relator filed an amended complaint prior to any answer or motion from the defendant. *Kroening*, 155 F. Supp. 3d at 885. The amended complaint was thus the first complaint subjected to the court's scrutiny. While the court dismissed it, it did so without prejudice: "It is certainly conceivable that the shortcomings identified in this decision may be successfully remedied by Kroening in a second amended complaint. The court finds that any risk of prejudice to the defendants is minimal. In the interest of justice, Kroening should be permitted to amend his complaint." *Id.* at 897. Walmart's sole authority, *Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994), is inapposite; the issue there was whether the district court abused its discretion by not allowing a plaintiff a *third* chance to re-plead, after having already found two attempts insufficient.

## CONCLUSION

For the reasons stated above, Walmart's Motion to Dismiss should be denied in full, other than as to Count Four of Relator's Complaint, which Relator hereby voluntarily dismisses, without prejudice.

---

*Ctr.*, 929 F. Supp. 2d 807, 827 (N.D. Ill. 2013) (in a False Claims Act case, "dismissal based on the statute of limitations is premature" given fact issues relating to equitable tolling and similar concepts).

Dated:  May 17, 2019

Respectfully submitted,

JENNIFER BUTH

By: */s/ Roger A. Lewis*        
    One of Her Attorneys

Nola J. Hitchcock Cross
Mary C. Flanner
CROSS LAW FIRM, S.C.
845 North 11th Street
Milwaukee, Wisconsin 53233
(414) 224-0000
njhcross@crosslawfirm.com
mflanner@crosslawfirm.com

Roger A. Lewis
David J. Chizewer
Matthew K. Organ
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 201-4000
roger.lewis@goldbergkohn.com
david.chizewer@goldbergkohn.com
matthew.organ@goldbergkohn.com

*Counsel for Plaintiff-Relator*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 17, 2019, he caused a copy of the **PLAINTIFF-RELATOR JENNIFER BUTH'S RESPONSE IN OPPOSITION TO DEFENDANT WALMART INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** to be served via the Court's ECF/electronic mailing system upon all counsel of record.

*/s/ Roger A. Lewis*